IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAIMLERCHRYSLER SERVICES NORTH
AMERICA, LLC f/k/a MERCEDES-BENZ
CREDIT CORPORATION, a Michigan limited
liability company,

Plaintiff/Counter-Defendant,

-vs-

Case No. 02-71871
Hon. Nancy G. Edmunds
Magistrate Wallace Capel, Jr.

SUMMIT NATIONAL, INC.,
an Illinois corporation,

      Defendant/Counter-Plaintiff.

_____/

| BODMAN, LONGLEY & DAHLING | JACKIER, GOULD, BEAN, UPFAL &EIZELMAN |
|---|---|
| By:   Joseph J. Shannon (P38041)<br>       Jane Derse Quasarano (P45514) | By:   Jonathan B. Frank (P42656) |
| Attorneys for Plaintiff/Counter-Defendant | Attorneys for Defendant/Counter-Plaintiff |
| 34th Floor, 100 Renaissance Center | 121 West Long Lake Road, Second Floor |
| Detroit, Michigan 48243 | Bloomfield Hills, Michigan 48304-2719 |
| (313) 259-7777 | (248) 642-0500 |

_____/

**REPLY BRIEF IN SUPPORT OF
MOTION IN LIMINE TO STRIKE SUPPLEMENTAL REPORT OF
AND RELATED TESTIMONY FROM THOMAS FRAZEE
PROOF OF SERVICE**

DCS's attempt to blame SNI for the late report should be rejected.

1

On February 13, 2004, SNI produced diskettes to DCS, along with the disclaimer that the 1997 and 1998 information was in DOS format and inaccessible. Nonetheless, this was the best that SNI could do; SNI simply did not keep this historic information in a better electronic form. The more recent information was in a QuickBooks program and was presumably accessible. *See SNI's Brief,* Exhibit E. DCS is therefore wrong when it states that SNI failed to inform DCS that some of the information "was corrupt...and could not be accessed." This is exactly what SNI did tell DCS about the older information. *See DCS's Brief,* Exhibit C for undersigned counsel's March 6, 2004 additional explanation regarding the DOS disk. SNI counsel had no idea that there was a problem with the more recent QuickBooks information, however, and neither did DCS's counsel.

The remainder of February, all of March, all of April, and most of May then passed.

On May 24, just four days before the expert report was due, DCS's counsel identified, for the first time, a concern with the more recent QuickBooks information (not with the 1997 and 1998 information). There is only one way to interpret this: Mr. Frazee waited until May 24 to start working on this project, and he assumed that it would take him, at the most, four days. Indeed, DCS's counsel confirmed in her May 24 letter that Mr. Frazee's report would be due June 1 (the extension agreed to by undersigned counsel), even knowing of the problem with the QuickBooks information. SNI counsel asked DCS counsel to identify her specific concerns.

Two days later, on May 26, DCS counsel identified some specific problems with the QuickBooks information. That day, SNI counsel had SNI deliver new disks by overnight delivery (SNI is in Chicago).

2

These were provided to Mr. Frazee on May 27. Mr. Frazee did not identify his need for a password on May 27 or 28 (nor did SNI counsel even know that a password was required). June 1 came and went. On June 7, DCS's counsel requested the password, and it was provided that same day. Twenty two days later, on the eve of his deposition, Mr. Frazee delivered his new report.

All else aside, the Court needs to know only one thing: the first time that DCS raised a concern about the QuickBooks information was on May 24. Mr. Frazee's report was due on May 28, then extended until June 1. ***He delivered his report on June 29, one day before his deposition.*** DCS also delivered certain documents that day, even though Mr. Frazee testified in his deposition that he had provided these documents to DCS earlier in the month. Exhibit A. If DCS's footnote one is accurate, DCS apparently decided to direct Mr. Frazee to wait until the last minute to start working, thereby taking the risk that its motions for summary judgment would not be granted. But even that excuse rings false: the Court issued its opinion denying DCS's motions on April 8, 2004. Mr. Frazee did not identify the need for better information for over six weeks after that.

DCS seeks to inflame the Court by asserting that SNI has kept bad internal accounting records, as if SNI's internal record-keeping practices was at the heart of this case. As the other briefs recently filed make clear, there is very limited relevant information that can be culled from SNI's financial records – primarily, SNI's historic license fees. These are well-documented and in fact were analyzed in Mr. Frazee's timely June 1 report.

Finally, DCS relies on Rule 26(e)(1), which provides for supplemental reports. Mr. Frazee's June 29 report was not a supplemental report. It was a new report. And it was based on information provided on February 13. SNI did not withhold anything, Mr. Frazee just started too late.

Respectfully submitted,

JACKIER, GOULD, BEAN, UPFAL & EIZELMAN

By: _____
Jonathan B. Frank (P42656)
Attorney for Defendant
Second Floor, 121 West Long Lake Road
Bloomfield Hills, Michigan 48304
(248) 642-0500

Dated: July 19, 2004

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all the parties in the above cause by serving same to them at their respective business addresses as disclosed by the pleading of record herein on the **19th** day of **July, 2004**, via:

| | |
|---|---|
| __X__ U.S. Mail | _____ Facsimile |
| _____ Hand Delivery | _____ Overnight Mail |

_____
Theresa Sienko

J:\2981\1\00032042.WPD

4

# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION
 3   DAIMLERCHRYSLER SERVICES NORTH
     AMERICA, LLC f/k/a MERCEDES-BENZ
 4   CREDIT CORPORATION, a Michigan limited
     liability company,
 5
              Plaintiff/Counter-Defendant,
 6
     vs.                              Case No. 02-71871
 7                                    Hon. Nancy G. Edmunds
     SUMMIT NATIONAL, INC.,
 8   an Illinois corporation,
 9            Defendant/Counter-Plaintiff.
     _____/
10
11         The Deposition of THOMAS FRAZEE taken by Summit
12   National pursuant to Notice, before Elizabeth A. Tubbert, RPR,
13   (CSR-4248), a Notary Public within and for the County of
14   Oakland, (acting in Wayne County), State of Michigan, at The
15   Westin Detroit Metropolitan Airport, 2501 Worldgateway Place,
16   Romulus, Michigan, on Wednesday, June 30, 2004.
17
18   APPEARANCES:
19
           BODMAN, LONGLEY & DAHLING, LLP
20         By:  JANE DERSE QUASARANO, Esq.
                JOSEPH J. SHANNON, Esq.
21         100 Renaissance Center, 34th Floor
           Detroit, Michigan  48243
22         (313) 295-7777
23              Appearing on behalf of the Plaintiff/Counter-
                Defendant
24
25
                (APPEARANCES CONTINUED ON PAGE 2.)
```

1              to you already.

2   Q    And those, somewhere in them, contain references to
3        what?  Either because they're the vendor putting out
4        this information or the purchaser putting out this
5        information somebody reported something about 1
6        percent?

7   A    Well, those documents give an understanding of how
8        one of those transaction works, what types of fees
9        are charged in those transactions and then also
10       provide specific numbers, for example.  So I guess I
11       would explain it as those documents don't necessarily
12       say I will charge you 1 percent for this but they
13       provide the background and perspective to understand
14       that that's the appropriate number.

15  Q    Did you prepare any kind of schedule summarizing any
16       of those other documents showing what information was
17       in them?

18  A    No.

19  Q    Any notes of that?

20  A    No.

21  Q    How would I be able to reconstruct your process from
22       beginning to end to know how you got to 1 percent?

23  A    It's based on my judgment and it's based on a review
24       of those documents.  So you could read the documents
25       and interpret the economic relationships between the

1       various entities that are involved.

2                    MR. FRANK:  I've got to say on this

3       issue, Jane, as opposed to all the other ones, the

4       volume of stuff that I got and now his indication

5       that that's what he looked at to get to 1 percent

6       makes it impossible for us sitting here -- for to me

7       to do that.  That's why I wanted this stuff earlier.

8       Because I wanted to know specifically about that

9       number.

10  Q   (By Mr. Frank)  How long do you think it --

11  A   Those documents were produced to you some time ago.

12  Q   Yesterday.

13  A   No, these weren't.  These are SEC filings that -- my

14      office did not produce them to you yesterday.

15  Q   I got them from Bodman yesterday.  That's the

16      problem.

17  A   Okay.

18  Q   How long would it take you to go through that box of

19      documents while we're sitting here, tell me which

20      ones you looked at and how they got to the 1 percent

21      number?

22  A   I don't know.  It would take me some time.

23  Q   Okay.  We'll talk about later how we'll deal with

24      that.

25                   Are you comfortable that 1 percent is an

1               accurate figure?
2     A         I think it's a reasonable estimation. In fact, it
3               may be even a little bit high.
4     Q         But you were comfortable enough to put it onto your
5               report; right?
6     A         Yes.
7     Q         The information at the bottom of Exhibit D which are
8               the (A), (B), (C), those were provided to you by
9               somebody else; correct? You didn't do that analysis?
10    A         I believe that this was provided as part of maybe one
11              of the affidavits that was filed in the case in terms
12              of the -- for instance, number of programs, line of
13              code dollar investment. Those were provided as part
14              of one of the affidavits. I don't recall whose.
15    Q         If I understand right, you averaged those three
16              numbers; correct?
17    A         No, I don't think we averaged them. I believe we
18              just looked at them in aggregate. I don't remember
19              exactly how the mathematical conclusion of 2 percent
20              was reached.
21    Q         That was my next question. If you averaged it, it
22              comes to about 2, because you have 6.53 divided by 3.
23              So how did you get to 2 instead of some other number?
24    A         Like I say, I don't recall the exact -- whether there
25              was a precise mathematical calculation. My answer to