IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAIMLERCHRYSLER SERVICES NORTH
AMERICA, LLC f/k/a MERCEDES-BENZ
CREDIT CORPORATION, a Michigan limited
liability company,

Plaintiff/Counter-Defendant,

-vs-

Case No. 02-71871
Hon. Nancy G. Edmunds
Magistrate Wallace Capel, Jr.

SUMMIT NATIONAL, INC.,
an Illinois corporation,

Defendant/Counter-Plaintiff.

_____/

| BODMAN, LONGLEY & DAHLING | JACKIER, GOULD, BEAN, UPFAL &EIZELMAN |
|---|---|
| By:   Joseph J. Shannon (P38041)<br>         Jane Derse Quasarano (P45514) | By:   Jonathan B. Frank (P42656) |
| Attorneys for Plaintiff/Counter-Defendant | Attorneys for Defendant/Counter-Plaintiff |
| 34th Floor, 100 Renaissance Center | 121 West Long Lake Road, Second Floor |
| Detroit, Michigan 48243 | Bloomfield Hills, Michigan 48304-2719 |
| (313) 259-7777 | (248) 642-0500 |

_____/

**REPLY BRIEF IN SUPPORT OF MOTION TO LIMIT FRAZEE'S TESTIMONY**

# TABLE OF AUTHORITIES

*Andreas v. Volkswagen of America,*
    336 F.3d 789 (8th Cir. 2003)...............................................................................3

*Jones v. Carter Construction Co.,*
    266 Ark. 358 (1979)............................................................................................4

*On Davis v. The Gap, Inc.,*
    246 F.3d 152 (2nd Cir. 2001)..............................................................................1

Mr. Frazee has spent his eight-year career valuing businesses, and SNI will assume that he is now good at that. Despite DCS's effusive praise of Mr. Frazee and his "preeminent" firm, however, he has no experience in the three areas identified by SNI's motion. He does not know anything about pricing, he cannot interpret a software license agreement, and he made up an "asset-percentage" method that has nothing at all to do with copyright law or any other damages theory.

*Pricing*

Here is the proof at trial regarding actual damages: SNI will prove the license fee that it would have charged DCS during and after termination. This proof will be based on historic license fees and factors specific to DCS's use of and need for ALAS. As one of the cases cited by DCS explains, after repeatedly stressing that § 504 should be "broadly construed to favor victims of infringement" and in the midst of analyzing § 504 in way that completely supports SNI:

> If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, it seems entirely reasonable to conclude that the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for.

*On Davis v. The Gap, Inc.*, 246 F.3d 152, 165 (2nd Cir. 2001). The *On Davis* court also stressed that the fee that might be "exacted" would depend on the licensee's specific use of the infringing product. *Id.*, at 166, n. 5 ("the fair market value to be determined is not of the highest use for which plaintiff might license but ***the use the infringer made***.")(emphasis added).[1] The court then emphasized that "finding the fair

---

[1] SNI can imagine "higher uses" than DCS's use of ALAS to run the $2.4 billion Mercedes lease business. For example, DCS could have licensed ALAS for all of its leases. Ford, General Motors or other vehicle companies could have licensed ALAS to run portfolios much larger than $2.4 billion. According to *On Davis*, SNI could not introduce evidence related to these "higher uses", but must instead relate the price to DCS's use. That is what SNI intends to do.

1

market value of a reasonable license fee may involve some uncertainty." *Id.*, at 166. When the Court reads *On Davis*, and especially when the Court reads the holding that the plaintiff should have been permitted to present evidence of historic license fees and how they might be extrapolated to the defendant's specific use, the Court will find that DCS's analysis of *On Davis* is exactly backward; ***the jury must be able to consider both SNI's motivation to get the highest possible price and DCS's motivation to avoid shutting down a $2.4 billion enterprise***.

In response, Mr. Frazee will apparently testify that SNI historically charged lower fees to other customers. This is a fact, indeed it is a fact that could be stipulated to. So what is his expertise? According to his report, he will also testify that the price ***that DCS would have paid*** is "de minimis." This is where he runs into trouble, because this is where he has no expertise. He did not even know enough to interview his own client, the customer, and he neglected to consider the motivations of the licensor and the licensee. He could not identify an authoritative source or treatise. He has never performed this exercise before. He is not a software, licensing or pricing expert.

### Contract Interpretation

DCS concedes this point. Mr. Frazee has no business giving expert testimony regarding the meaning of the license agreement.

### Post-Termination Damages

DCS has never understood how the law of copyright damages applies to this case. Specifically, DCS has never understood that Section 504(b) shifts the burden to DCS once SNI demonstrates that the infringement generated revenue. SNI did that by noting that DCS admitted in its complaint and in deposition testimony that without the critical ALAS system it would have to shut down the Mercedes leasing operation, and that this would cost DCS "millions of dollars." DCS's Amended Complaint, ¶29.

DCS further admitted that it continued to use ALAS after termination of the license, and that the annual revenue from the business that used ALAS was $2.4 billion. DCS now admits that its annual profit on this revenue is at least $200 million. As required by case law, SNI is not relying on corporate-wide revenue, but only on revenue generated through the use of the infringing ALAS system. SNI does not need an expert witness to testify to these facts, since SNI is relying on information that **DCS provided** in its pleadings and in discovery, all of which establishes the "causal connection" between ALAS and DCS's revenue.

When DCS tried to keep this issue from going to trial by filing a motion for partial summary judgment, the Court rejected DCS's argument. All of the cases cited by DCS in that motion and in its current brief are fundamentally distinct from this case, because in none of those cases did the infringer concede that the infringing product was at the core of its ability to generate revenue. The recent decision in *Andreas v. Volkswagen of America*, 336 F.3d 789 (8th Cir. 2003) provides the best summary of the law in this area. In *Andreas*, the plaintiff copyrighted a phrase similar to one used in the defendant's television commercial for the Audi TT car. Affirming an award of just under $1 million, the Court of Appeals noted that "any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff..." *Id.*, at 795 (citation omitted). Having established a relationship between the infringement and the generation of revenue, as SNI has here, the plaintiff in *Andreas* "was required under the statute only to establish Audi's gross revenue from the TT coupe." *Id.*, at 797. SNI has introduced exactly such evidence here, limiting its proof to the Mercedes Benz lease portfolio run through ALAS. As the *Andreas* Court concluded, "the district court's error was in placing the detriment of any speculation on [plaintiff] rather than on Audi." *Id.*, at 797. In sum, the Court confirmed (1) Congress's intent to protect the copyright owner and (2) the infringer's burden to prove the extent to which infringement ***contributed*** to profits, stating that:

3

> We recognize that it is difficult to establish the portion of profits attributable to an infringement in cases where the infringed material is used in an advertisement for another product, but Congress put the burden of establishing "elements of profit attributable to factors other than the copyright work" on the defendant. Further, Congress did not distinguish between direct and indirect profits cases in allocating the burden of proof between establishing the fact that an infringement ***contributed to*** a defendant's profits and the extent to which the infringement ***contributed to*** the profits. We hold that the jury's conclusion that Andreas established a nexus between Audi's infringing use of his copyrighted work and Audi's profits from the sales of the TT coupe is sufficiently supported by the evidence so as to defeat a motion for JAML. The district court erroneously placed the burden of establishing the extent that the infringement ***contributed to*** Audi's profits on Andreas rather than on Audi as the infringing defendant. (Emphasis added)

Now, DCS has chosen Mr. Frazee to testify in order to meet DCS's burden of proof. DCS's burden of proof is to establish the extent to which other factors ***contributed to its profits***. Mr. Frazee, however, did not address this issue when he applied his "asset percentage" method. He addressed a different issue: as a mathematical fact, what amount of DCS's profits relate back to each of DCS's assets on a pro rata basis. There is no support for this method in his background or in damages jurisprudence. The Court should therefore strike his "asset percentage" method.

To refute the fact that no court in the rapidly evolving copyright damages area has recognized the "asset percentage" method, DCS cites a twenty-five-year-old Arkansas state tax case. *Jones v. Carter Construction Co.*, 266 Ark. 358 (1979). This case involved "carry-over net operating losses", and undersigned counsel is frankly mystified how DCS thought it might apply here (DCS does not say, either, when it simply cites the case).

Even more remarkably, if that is possible, DCS then refers to three different publications, identified only by their cover pages. What makes this so remarkable is that Mr. Frazee (1) did not identify these in his report, despite the requirements of Rule 26(a)(2)(B); (2) did not produce these in response to the deposition notice specifically requesting him to produce "all treatises or other authoritative materials relied

4

upon" (Exhibit A); (3) did not identify these in his deposition when he was directly asked to do so (Exhibit B); and (4) even now, does not provide the Court with any explanation of what these three publications are or what they mean to this case. It is not even clear that he was responsible for finding them.

DCS's brief is full of flaws, but the brief is as significant for what it does not say. DCS never refutes the fact that the "asset-percentage" method makes no sense, or that its application to only one date, December 31, 2003, makes it irrelevant to this case. Finally, DCS's brief does not rebut the fact that Mr. Frazee, and other DCS witnesses and documents, confirm that ALAS directly contributes to at least $200 million in annual revenue.

The Court should limit Mr. Frazee's testimony.

Respectfully submitted,

JACKIER, GOULD, BEAN, UPFAL & EIZELMAN

By: _____
Jonathan B. Frank (P42656)
Attorney for Defendant
Second Floor, 121 West Long Lake Road
Bloomfield Hills, Michigan 48304
Dated: July 19, 2004            (248) 642-0500

5

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all the parties in the above cause by serving same to them at their respective business addresses as disclosed by the pleading of record herein on the **19th** day of **July, 2004**, via:

    __X__ U.S. Mail                             _____ Facsimile
    _____ Hand Delivery               _____ Overnight Mail

*/s/ Theresa Sienko*
Theresa Sienko

J:\2981\1\00032121.WPD

LAW OFFICES JACKIER, GOULD, BEAN, UPFAL & EIZELMAN, P.C., SECOND FLOOR, 121 W. LONG LAKE ROAD, BLOOMFIELD HILLS, MICHIGAN 48304-2719  (248) 642-0500

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAIMLERCHRYSLER SERVICES NORTH
AMERICA, LLC f/k/a MERCEDES-BENZ
CREDIT CORPORATION, a Michigan limited
liability company,

        Plaintiff/Counter-Defendant,

-vs-

SUMMIT NATIONAL, INC.,
an Illinois corporation,

        Defendant/Counter-Plaintiff.

Case No. 02-71871
Hon. Nancy G. Edmunds
Magistrate Wallace Capel, Jr.

_____/

| BODMAN, LONGLEY & DAHLING | JACKIER, GOULD, BEAN, UPFAL & EIZELMAN |
|---|---|
| By:   Joseph J. Shannon (P38041) | By:   Jonathan B. Frank (P42656) |
|       Jane Derse Quasarano (P45514) | |
| Attorneys for Plaintiff/Counter-Defendant | Attorneys for Defendant/Counter-Plaintiff |
| 34th Floor, 100 Renaissance Center | 121 West Long Lake Road, Second Floor |
| Detroit, Michigan 48243 | Bloomfield Hills, Michigan 48304-2719 |
| (313) 259-7777 | (248) 642-0500 |

_____/

**NOTICE OF DEPOSITIONS DUCES TECUM**
**PROOF OF SERVICE**

Defendant will take the following depositions on June 30, 2004 at the Detroit Metropolitan Airport: a representative of SRR at 12:00 p.m.; Bernard Galler at 3:00 p.m. Plaintiff's counsel has agreed to arrange for the precise location. The depositions may be video-recorded; Defendant's counsel will confirm this by June 25, 2004.

On June 25, 2004 at 10:00 a.m., both witnesses are to produce their entire file related to this case for review and copying at the office of undersigned counsel. This file shall include but is not limited to

-1-

all time records, hard copy of all electronic information, all draft reports, all evidence of communication with counsel, all evidence of communication with any representative of Plaintiff, all evidence of communication with any other expert (including, for the SRR representative, all evidence of communication within SRR, and for Galler, all evidence of communication with Brush), all treatises or other authoritative materials relied upon, all information that the expert has relied on, considered, or received, and all information listed in the expert reports. The representative of SRR shall also produce all materials listed as "Recent Presentations" for the period January 1, 2000 to the present for all three members of SRR identified in the SRR expert report. The representative of SRR shall also identify which of the cases listed as "Recent Expert Testimony" for all three members of SRR identified in the expert report involved the valuation of software, copyrights or license agreements.

Respectfully submitted,

JACKIER, GOULD, BEAN, UPFAL & EIZELMAN

Dated: June 18, 2004

By: Jonathan B. Frank (P42656)

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all the parties in the above cause by serving same to them at their respective business addresses as disclosed by the pleading of record herein on the 18th day of June, 2004, by:

    __X__ U.S. Mail     __x__ Facsimile
    _____ Hand Delivery     _____ Overnight Mail

Theresa Sienko

00031000.WPD

-2-

# EXHIBIT B

Page 1

```
 1              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION
 3   DAIMLERCHRYSLER SERVICES NORTH
     AMERICA, LLC f/k/a MERCEDES-BENZ
 4   CREDIT CORPORATION, a Michigan limited
     liability company,
 5
              Plaintiff/Counter-Defendant,
 6
     vs.                              Case No. 02-71871
 7                                    Hon. Nancy G. Edmunds
     SUMMIT NATIONAL, INC.,
 8   an Illinois corporation,
 9            Defendant/Counter-Plaintiff.
     _____/
10
11          The Deposition of THOMAS FRAZEE taken by Summit
12   National pursuant to Notice, before Elizabeth A. Tubbert, RPR,
13   (CSR-4248), a Notary Public within and for the County of
14   Oakland, (acting in Wayne County), State of Michigan, at The
15   Westin Detroit Metropolitan Airport, 2501 Worldgateway Place,
16   Romulus, Michigan, on Wednesday, June 30, 2004.
17
18   APPEARANCES:
19
         BODMAN, LONGLEY & DAHLING, LLP
20       By:  JANE DERSE QUASARANO, Esq.
              JOSEPH J. SHANNON, Esq.
21       100 Renaissance Center, 34th Floor
         Detroit, Michigan  48243
22       (313) 295-7777
23            Appearing on behalf of the Plaintiff/Counter-
              Defendant
24
25
                 (APPEARANCES CONTINUED ON PAGE 2.)
```

1  A    No.

2  Q    What about between any of the other staff people?

3  A    That's what I was trying to address in your earlier
4       question. My recollection, again, is that -- there
5       was not any communication in an e-mail form between
6       me and any of the staff members that were involved in
7       this.

8  Q    But what about between them and each other?

9  A    I am not aware of any. I did not check that.

10 Q    That's just because you thought there weren't any
11      that you relied; right?

12 A    Yes, because it's fairly atypical that the staff
13      would be communicating via e-mail on this type of a
14      case.

15 Q    I asked you if you communicated with the other
16      expert, Professor Bernard Galler?

17 A    No, I did not.

18 Q    There is another expert, a computer guy, named Jeff
19      Brush. Did you communicate with him?

20 A    No, I did not.

21 Q    I asked for treatises and other authoritative
22      materials you relied on. Your counsel has suggested
23      to me that other than what's in the box, there are no
24      such treatises or authoritative material; is that
25      correct?

| | | |
|---|---|---|
| 1 | A | First, Bodman is not my counsel. Second, there are -- I have not produced any additional documents beyond those that were marked this morning as well as those that were produced yesterday that I would view as authoritative treatises that I relied upon. |
| 6 | Q | I asked you to produce your recent presentations from January 1, 2000 to the present, which would be materials that were involved in any of the presentations that are listed with your CV. Did you produce those to me yesterday? |
| 11 | A | No, I did not. |
| 12 | Q | Why not? |
| 13 | A | I was unable to have them located and copied in order to get that to you yesterday. So I did not. |
| 15 | Q | You still plan to get me those? |
| 16 | A | I will. |
| 17 | Q | The request was actually for not just yours but Mr. Sheets and Mr. Risius as well for that period of time. Can you collect those to the extent you have those available? |
| 21 | A | I will endeavor to do that. |
| 22 | Q | Do you have a copy of your report in front of you, the first one? |
| 24 | A | Yes, I do. |
| 25 | Q | The first thing I want to cover with you is just you |

1         intellectually very appropriate. As I have said
2         before, there is an element of -- you have to
3         consider the specific asset and the specific facts
4         and situations associated with whatever asset you are
5         carving out. And in your example it was a building.
6         But the intellectual framework I think is
7         appropriate.
8    Q    Have you ever testified to this method of attributing
9         profit to an asset?
10   A    A lot of the cases that I have provided testimony in
11        deal with some sort of a dispute related to an asset
12        in which the determination of profits generated from
13        the asset is definitely relevant.
14   Q    I'm asking you -- and we're going to call this Method
15        1, because that's the way you described it, which is
16        to take a pie of total assets, figure out the slice
17        that is a particulate asset you're concerned with,
18        move over to the pie of profit and apply the same
19        percentage. Have you done that before in testimony?
20   A    I don't think that I've had to testify in a case on
21        that specific methodology.
22   Q    Is that a methodology that you can tell me is
23        contained within any treatise or publication that you
24        have ever read?
25   A    I don't know that I can say that specific treatise

1       for it but the general underlying principle is
2       something that is widely accepted.  And that is that
3       each asset -- each operating asset of a business
4       contributes in some way to the profits of the
5       business.  And so one of the methods to determine the
6       values of a specific asset amongst a whole group of
7       other assets held within that business is to look at
8       the profits that it contributes relative to the other
9       ones.
10   Q  I agree with the general statement.  I'm asking you a
11      separate question, which is the method for doing
12      that.  I agree with the statement that assets
13      contribute to profits.  But you've done a specific
14      methodology, and I want to know if the methodology
15      you've used, which you've described as Method 1, you
16      can tell me exists in any treatise or publication
17      you've ever seen before?
18   A  I don't know that I can or that I can't.  I'm not
19      prepared to say to you today that it does exist in
20      XYZ treatise or does not exist.
21   Q  Have you ever heard of it being proposed as a method
22      in any seminar that you've been to on valuing assets
23      for businesses for profits?
24   A  Again, I don't recall that I've heard a specific
25      description of this methodology in one of those