UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAIMLERCHRYSLER SERVICES,

    Plaintiff,

v.

SUMMIT NATIONAL,

    Defendant.
                                     /

Case No. 02-71871

Honorable Nancy G. Edmunds

**ORDER DENYING PLAINTIFF'S MOTION TO VACATE ORDER [323], DENYING PLAINTIFF'S MOTION TO STRIKE AND TO IMPOSE SANCTIONS [328], AND DISMISSING DEFENDANT'S COPYRIGHT AND TRADE SECRETS CLAIMS**

      This case began just over four years ago, when Defendant Summit National, Inc. ("SNI") discovered that it had an ownership interest in Automated Leasing Account System ("ALAS") software, which was used by Plaintiff DaimlerChrysler Services ("DCS"). SNI's predecessor, Stockholder Systems, Inc. ("SSI"), had entered into a perpetual software licensing agreement with DCS's predecessor, Mercedes-Benz Credit Corporation ("MBCC"). SNI determined that DCS was in breach of the agreement, and sent a letter to DCS demanding DCS to cease use of ALAS.

      DCS responded with a declaratory action against SNI, apparently attempting to shake off a pesky litigant. SNI counterclaimed, however, and as the facts developed in its favor--or were represented to have developed in its favor--this case turned into a massive lawsuit with hundreds of millions of dollars in potential damages, most of which were based on SNI's copyright and trade secret claims. Now, after a number of twists and turns and

further development of the facts, the case has come full circle. For the reasons discussed below, the Court hereby DISMISSES SNI's copyright and trade secrets claims.

**I.    Background**

The early background to this case has been accurately summarized by the Sixth Circuit Court of Appeals:

> In 1983, SSI, which owned and marketed ALAS, entered into a "Software System Agreement" under which SSI granted MBCC a "perpetual license" to use ALAS at its Portland, Oregon facility. DCS is the successor-in-interest to MBCC. ALAS provided the software platform used by DCS to track leasing contracts, leasing customers, and vehicles subject to lease in the United States and Canada. The Software Agreement contemplated that the software would be used only by DCS at the Portland facility to process its own data and the data of any of DCS's wholly owned subsidiaries. The agreement stated that DCS could not use ALAS, which was a "trade secret," at any other facility without notifying SSI and/or paying a license fee to SSI. There was also a non-disclosure provision in the agreement, charging DCS with the responsibility to "take all reasonable steps to ensure" that ALAS or any portion thereof would not be made available to any other person, firm, or corporation without SSI's written consent. DCS reserved "the right to modify the Products to meet DCS's particular needs and requirements," and SSI "acknowledged the proprietary rights of DCS in any such modification." SSI retained the right to terminate the agreement if DCS breached the agreement and failed to take corrective action within thirty days of receiving notice from SSI of such breach. . . .
>
> The last recorded installation of ALAS occurred in April 1993 in the Philippines. At some point between 1983 and 1998, Checkfree apparently acquired the rights to a system called ALAS from SSI. In July 1998, CheckFree sold certain assets to SNI. . . . [O]ne of these assets was the ALAS software and that SNI acquired all rights related to ALAS. . . .[1]
>
> The ALAS system was installed at DCS's Portland facility. However, many DCS employees, including about 1400 employees in 2002, logged on to ALAS from locations outside of Portland. . . . [D]uring the late 1990s, three outside companies worked on ALAS and had access to its source code. At various points during these companies' work on ALAS, the ALAS source

---

[1]In earlier stages of litigation, SNI's ownership rights to ALAS were contested. That issue has since been resolved.

code was downloaded and moved to facilities other than the Portland facility, including a DCS facility in Connecticut. [E]mployees of an independent contractor, Ciber, continued to work on support and programming of the ALAS system in 2003. . . . [T]hese contractors had access to the ALAS source code. . . . [A]ll third parties who had access to ALAS were required to sign confidentiality agreements. . . .

DCS . . . presented evidence suggesting that the ALAS system in use by DCS . . . was not the same as, or even relatively similar to, the ALAS system licensed . . . by SSI in 1983. . . .

On April 18, 2002, DCS received a letter (dated April 10) notifying it that SNI considered DCS in breach of the Software Agreement. SNI invoked the 30-day cure period set out by the agreement and demanded that DCS cease its breach of the agreement within that period. In a letter dated May 10 (but received by DCS on May 8), SNI informed DCS that it was terminating the agreement and demanded the cessation of the use of all licensed SNI products.

*DaimlerChrysler Servs. N. Am. v. Summit Nat'l, Inc.*, 144 Fed. Appx. 542, 543-46 (6th Cir. 2005) (footnotes omitted) (some brackets omitted).

DCS initiated this case on May 9, 2002, by filing an action for a declaratory judgment that it was not in breach of the Software Agreement. SNI counterclaimed, seeking a declaratory judgment that DCS was in breach, as well as injunctive relief prohibiting DCS from continued use of ALAS.

In early 2003, the parties filed cross-motions for summary judgment. Based on the claims and counterclaims, the only issue before the Court was a relatively straightforward contract question: Whether DCS had breached the Software Agreement. Notwithstanding its failure to plead the issue, however, SNI also argued that DCS had infringed upon its copyright in ALAS.

On May 20, 2003, this Court issued an Order denying DCS's Motion for Summary Judgment and granting in part SNI's Motion for Partial Summary Judgment ("the May 2003

Order"). Among its findings, the Court ruled that (1) SNI has ownership rights in ALAS, (2) a genuine issue of material fact exists as to whether DCS violated the Software Agreement by using ALAS at remote locations, (3) DCS breached the Software Agreement by disclosing ALAS to third parties, (4) SNI had not shown the absence of a genuine issue of material fact as to whether DCS infringed SNI's copyright in ALAS (or even pled the issue), and (5) a genuine issue of material fact existed as to whether SNI suffered any damages by DCS's disclosure of ALAS to third parties. Because DCS had breached the Software Agreement by disclosing ALAS to third parties, the Court granted the equitable remedy that SNI sought: enforcement of the terms of the contract and revocation of DCS's license. The Court issued a permanent injunction requiring DCS to halt its use of ALAS software within 180 days.

In June of 2003, SNI amended its counterclaim to add counts of misappropriation of trade secrets and copyright infringement. DCS then amended its complaint to add a claim of civil extortion.

Largely in response to SNI's amended counterclaim, DCS filed a second Motion for Summary Judgment.[2] DCS argued that summary judgment was appropriate because (1) SNI did not have the 1983 ALAS source code, and therefore could not establish a genuine issue of material fact as to copyright infringement, breach of contract, or trade secret misappropriation; (2) SNI's claimed damages were purely speculative; and (3) SNI had waived its rights by failing to stop past disclosure of ALAS source code. In an April 8, 2004

---

[2]DCS also filed a Motion to Dismiss SNI's Amended Counterclaim on July 3, 2003. The Court denied that Motion on October 9, 2003.

4

Order, the Court found that genuine issues of material fact remained regarding these issues, and denied DCS's Motion ("The April 2004 Order").

There are two aspects of the April 2004 Order that are relevant for the present purposes. First, as to SNI's contract claim, the Court made the following finding, based on evidence and arguments that had developed through discovery since the May 2003 Order:

> [T]o succeed on a breach of contract claim, SNI must prove a breach and damages resulting from the breach. . . . SNI alleges that DCS breached the Agreement by exposing the ALAS code to third parties. DCS defends that the code revealed to third parties was DCS code because of the multitude of modifications DCS made to the original code. However, DCS's own witnesses have identified the ALAS code on the DCS mainframe. Therefore, *a genuine issue of material fact remains as to whether the code revealed to third parties was the original source code, or whether it was modified to the extent that the original code was obsolete.*

(Doc. 213 at 18.) The Court understands that this statement appears on its face to be inconsistent with the earlier grant of summary judgment on behalf of SNI on the issue of DCS's breach of the Software Agreement by disclosing ALAS to third parties. The Court did not, however, intend to reverse itself as to that issue. Instead, this statement acknowledges the relevance of DCS's modifications to ALAS for purposes of determining SNI's potential damages. The Court wishes to make clear that it has always considered DCS to have breached the Software Agreement by disclosing ALAS source code to third parties, and continues to see this as a settled issue.

Second, the April 8, 2004 Order relied on some important assumptions in denying summary judgment to DCS as to SNI's copyright and trade secrets claims. The Court noted, for example, "Copies of ALAS 6.0, 7.0 and 9.0 have been produced according to SNI," and, "SNI claims that it has the ALAS 6.0 source code." (Doc. 213 at 6, 16.) These statements were not surprising at the time, given SNI's repeated assertions that "SNI has

the source code that it believes was licensed to DCS" and "SNI has located and is examining source code to respond to DCS's recent request to produce the 1983 source code." (Doc. 131 at 1, 3.) Moreover, in rejecting DCS's claim that SNI had an invalid copyright, the Court assumed that "ALAS 6.0 was copyrighted since a notice of copyright was incorporated into the source code, as attested to by DCS employee Victor Inglese." (Doc. 213 at 7.) At the time, "the parties [did] not dispute that the source code for ALAS 6.0 installed at DCS contained a copyright notice." (*Id.* at 6.)[3]

On August 18, 2005, the Sixth Circuit Court of Appeals affirmed this Court's May 2003 Order. Although the Court of Appeals decision did not fully review this Court's April 2004 Order, the court briefly discussed the apparent inconsistency between the two Orders:

---

[3]These facts provided the basis for distinguishing two cases cited by DCS in support of its Motion for Summary Judgment as to the copyright issue:

> DCS cites . . . *Bridgmon v. Array Systems Corp.*, 325 F.3d 572 (5th Cir. 2003). In *Bridgmon*, the plaintiff asserted claims for copyright infringement and breach of contract. The court there rejected the copyright claim because no copy of the software could be produced for comparison. Notably, the plaintiff in *Bridgmon* relied on just his own oral testimony and a witness'[s] reconstruction of the code as proof. *See id.* at 576. Here, the ALAS code is available for comparison by the Court and the parties' experts, so *Bridgmon* does not support DCS's [argument]. Furthermore, DCS's own employees testified that ALAS was installed on the DCS system, and that it contained a notice of copyright.
>
> DCS also relies on . . . *Coles v. Wonder*, 283 F.3d 798 (6th Cir. 2002). In Coles, the plaintiff submitted a reconstruction of a recording with his copyright registration as opposed to a copy of the earlier recording. See id. At 801. The court in *Coles* held that the reconstruction was insufficient, and thus the registration was not valid. Coles is distinguishable here because this Court has not yet been presented with the source code . . . for a comparison . . . .

(Doc. 213 at 17.)

6

> DCS makes much of the district court's April 8, 2004, order, which is not the subject of this appeal but seems to contradict the May 2003 order granting partial summary judgment and granting a permanent injunction. In the April 8, 2004, order, the court stated that "a genuine issue of material fact remains as to whether the code revealed to third parties was the original source code, or whether it was modified to the extent that the original code was obsolete." . . . The tension between the court's two statements is understandable to some degree, as much of DCS's evidence tending to show that there were different versions of ALAS was not submitted until after the May 20 order issued. . . . Whatever the explanation for the possible inconsistency, any contradiction in the district court's rulings does not necessitate any action by this court in connection with this appeal. The April 2004 order is not before us now. Moreover, the district court can reconsider its own rulings at any time in order to maintain consistency with itself. *See United States v. Reid*, 357 F.3d 574, 580 (6th Cir. 2004) ("In both civil and criminal cases, a trial court is empowered to revisit any of its previous non-final rulings in the light of a perceived error or misjudgment, new relevant information, or even its simple conclusion that it may have acted in ill-considered haste."); *see also In re Air Crash Disaster*, 86 F.3d 498, 518 (6th Cir. 1996). In addition, the district court will have another opportunity to consider the import of the evidence on the issue of DCS's disclosures, because the details of what was disclosed and its usefulness are highly pertinent to the damages issue, which the district court has yet to resolve.

*DaimlerChrysler Servs.*, 144 Fed. Appx. at 549 (brackets omitted). The Sixth Circuit therefore acknowledged that the "tension" between this Court's May 2003 and April 2004 Orders was only a "possible inconsistency," and that the disclosure of ALAS source code to third parties remained "highly pertinent to the damages issue." Moreover, the court explicitly recognized that "the district court can reconsider its own rulings at any time in order to maintain consistency with itself." *Id*. As the facts have continued to develop, that is exactly what this Court has been compelled to do.

Since this Court ruled on the parties' Motions for Summary Judgment, both the legal posture and the facts of this case have changed in important ways. It has become clear that SNI does not possess its own copy of the ALAS 6.0 source code licensed by SSI to MBCC in 1983. SNI concedes this point, but maintains that whether it possesses ALAS

7

is irrelevant. (*See* Doc. 325 at 21-26.) Until recently, the Court did not have occasion to disagree. In early 2006, however, SNI was forced to make another stipulation that has altered this case dramatically: "Based on the recent de bene esse deposition testimony of two former SSI employees, [SNI] is willing to agree that there was no [copyright] notice and that Mr. Inglese gave incorrect testimony." (Doc. 314 at 2.) Thus, contrary to the Court's earlier understanding of the facts, it is now entirely clear that SNI never possessed ALAS 6.0 source code and that there was never a copyright notice on the ALAS 6.0 source code licensed to DCS. In addition, in response to DCS's and the Court's requests for a clearer picture of its claimed damages, SNI has recently withdrawn its claim for pre-termination damages relating to DCS's disclosure of ALAS source code to third parties.[4]

Based on these recent developments, the Court has been forced to revisit the following issues: (1) Given that ALAS 6.0 had no copyright notice, does SNI have a viable claim for copyright infringement? (2) Given that ALAS 6.0 had no copyright notice and that SNI has no copy of ALAS 6.0, does SNI have a viable claim for misappropriation of trade secrets? (3) Given that SNI has withdrawn its claim for pre-termination damages relating to DCS's disclosure of ALAS source code to third parties, does SNI have a viable claim for breach of contract?

---

[4]During a status conference on March 21, 2006, counsel for SNI stated, "No, if we're talking about the issue of whether I'm seeking damages because somebody came in, had access to, saw the source code and walked out the door with it, no, we've withdrawn those claims . . . ." (Mar. 21, 2006 Tr. at 33.)

## II.    Discussion

### A.    Copyright Claim[5]

SNI argues that notwithstanding its recent admission that the ALAS 6.0 source code licensed in 1983 lacked copyright notice, its copyright claim against DCS remains viable. "Because ALAS was not 'publicly distributed,' but was instead provided only to licensees with limited rights to use ALAS, no copyright notice was required under 17 U.S.C. § 101 and 405." (Doc. 297 at 14; Doc. 314 at 2.)

SNI relies on the doctrine of "limited publication," which alleviates the copyright notice requirement in certain instances. Professor Nimmer describes the doctrine as follows:

> A limited publication has been held to be a publication "which communicates the contents of a manuscript to a definitely selected group and for a limited purpose, without the right of diffusion, reproduction, distribution or sale." Thus, if an author distributes copies of his work to a circle of immediate friends with the express or implied understanding that such copies will not be duplicated or circulated, this is a limited publication. On the other hand, distribution to retailers for ultimate distribution to the general public in itself constitutes a general, not a limited, publication.

1-4 *Nimmer on Copyright* § 4.13[A] (footnotes omitted).

The facts of the present case fall somewhere between Nimmer's two examples. ALAS was not merely distributed to a "circle of immediate friends," but neither was it shipped "to retailers for ultimate distribution to the general public."

The record reveals that SSI was in the business of marketing and selling ALAS to anybody interested in using it. D.R. Grimes, a former SSI official, testified that SSI's

---

[5] On March 27, 2006, this Court issued an Order dismissing SNI's copyright claim. For purposes of clarity, the Court wishes to explain all of the recent changes to this case in a single opinion, and therefore republishes the March 27, 2006 Order here with a few modifications.

9

software "dealt with different kinds of things that banks did, but it was primarily banking or companies that did bank-like functions, financial systems."  These companies included "many corporations."  (Doc. 315 Ex. 2 at 10.)  He reiterated that SSI licensed its software products "to a variety of banks and other corporations."  (*Id.* at 14.)

In addition to Grimes's testimony, a "Joint Venture Agreement" between SSI and Louisiana National Bank required SSI to develop a "comprehensive marketing program" for ALAS, which included the distribution of brochures, mass mailings of solicitations, and advertisements in trade journals.  (Doc. 315 Ex. 1 at 3.)

Finally, SSI's 1984 prospectus, prepared in conjunction with its initial public offering, states that "[a]lthough financial institutions have been and continue to be the principal customers of [SSI], recent marketing efforts have emphasized licensing of its products to utilities and industrial companies."  The prospectus goes on to note that ALAS was licensed to fifty eight "Banks and Financial Institutions," two "Utilities," and ten "Corporate and Other."  (Doc. 315 Ex. 3.)

These facts set this case apart from the cases SNI relies upon.  In *Intown Enterprises, Inc. v. Barnes*, 721 F. Supp. 1263 (N.D. Ga. 1989), for example, the court noted that the materials at issue, building plans, had only been provided to a definite set of "subcontractors for bidding purposes" and "the appropriate governmental authorities for purposes of obtaining the required building permits."  *Id.* at 1265-66.  And in *Williams v. Arndt*, 626 F. Supp. 571 (D. Mass. 1985), the plaintiff, who had written a booklet on commodities trading, "sent a copy to about 10 of his more preferred customers who had ordered the booklet in response to a promotional flier . . . limited to certain customers."  *Id.* at 573.

Contrary to SNI's argument, ALAS was not merely provided to a "definite, very selective group." It was aggressively marketed and provided to anybody who would pay money for it, including banks, corporations, and utilities. The Court agrees with DCS and the cases it cites that the relevant inquiry is whether anybody who wanted a copy of ALAS could get one. *See, e.g., D.C.I. Computer Systems, Inc. v. Pardini*, 1992 U.S. App. LEXIS 29951, *2-3 (9th Cir. Sept. 15, 1992) (limited purpose test not met where software was licensed "to any automobile or recreational vehicle dealership in the country that would agree to enter into a contract" and the "purpose in distribution was pecuniary gain"). Viewed this way, SNI did not "limit" its publication of ALAS. At best, it limited its marketing efforts to the audience it deemed most likely to listen. This was not enough to protect ALAS as a copyright.

The Court is satisfied that SSI's publication of ALAS was not "limited" in the legal sense, and was sufficiently far reaching that copyright notice was required. Because ALAS 6.0 was not protected by the doctrine of "limited publication" and because the parties have stipulated that it contained no copyright notice, it is not protected under the law of copyright. SNI's claim of copyright infringement must therefore fail.

**B.    Trade Secrets Claim**

Although SNI alleged copyright infringement and misappropriation of trade secrets at the same time, the Court's attention--and, it seems fair to say, the parties' attention--has been focused primarily on SNI's copyright claim. When the Court was recently forced to

reevaluate the copyright claim for the reasons discussed above, however, it was also forced to take a closer look at SNI's trade secrets claim.[6]

Like its copyright claim, SNI's trade secret claim may potentially be affected by its recent stipulation that despite early evidence to the contrary, ALAS 6.0 has never been protected with copyright notice. DCS makes a strong argument that the absence of copyright notice, as well as SSI's widespread distribution of ALAS source code, compel a finding that ALAS 6.0 has never been a trade secret. The Court finds it unnecessary to reach this issue, however. Regardless of whether ALAS was protected as SSI's (or anybody else's) trade secret, SNI has never enjoyed such protection.

SNI now concedes that despite its repeated assertions earlier in this litigation, it has never possessed ALAS source code that it now claims as its own protected trade secret.

---

[6]In the April 2004 Order, the Court rejected DCS's contention that SNI's alleged inability to produce the ALAS source code defeated the trade secrets claim, and held that there was sufficient evidence to go to trial on the issue:

> SNI must prove that DCS disclosed or used SNI's trade secret without SNI's consent, and that at the time of disclosure or use, DCS knew that it had a duty to maintain the secrecy of the trade secret, or limit its use of it. The ALAS source code qualifies as a trade secret because it is a "program" that "derives independent economic value . . . from not being generally known" and efforts were made by SNI to maintain its secrecy. There is no authority to support DCS's contention that SNI's alleged inability to produce the ALAS source code warrants summary judgment in favor of DCS on this claim.

(Doc. 213 at 19 (internal citations omitted).)

In the same Order, the Court accepted SNI's assertion that it possessed ALAS source code. (*Id.* at 6, 16.) Thus, the Court was under the impression that SNI could produce ALAS source code, and therefore held that there was no factual support for DCS's argument. Nevertheless, the Court recognizes that this excerpt supports SNI's argument, and to the extent that the April 2004 Order might be seen as settling this issue, the Court expressly reverses itself based on further development of the record.

It obtained no source code in 1998 when it received the legal rights to ALAS, and despite its best efforts, has been unable to find ALAS source code on the market.[7] SNI argues, however, that possession is irrelevant, because "[t]he key concept is ownership, not physical possession." (Doc. 325 at 22.)[8] SNI is correct that courts typically focus on ownership as a required element of a claim for trade secrets misappropriation. *See* 4-15 Milgrim on Trade Secrets § 15.01 [1](1). This does not mean that possession is irrelevant, however. Rather, in a typical trade secrets case, there is no need to focus on possession, since it is generally subsumed within ownership. And as a practical matter, only a party that is privy to a trade secret would have cause to oppose the misappropriation of that secret. This is what sets SNI's trade secrets claim against DCS apart and, ultimately, renders it futile.

Under the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. L. § 445.1901 *et seq.*, a "trade secret" is defined as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

[7]SNI has found some source code that, like DCS's source code, contains elements of ALAS within it or is heavily modified ALAS source code.

[8]Curiously, SNI goes on to suggest that ownership and possession are the same thing: "Simply put, [SNI] owns ALAS and . . . possesses ALAS directly and indirectly (it possesses ALAS everywhere its licensees possess ALAS)." (Doc. 325 at 24.)

13

*Id.* § 445.1902.

As the text of MUTSA suggests, the entire concept of a trade secret is something that has value *because of its secrecy*. Indeed, pre-MUTSA, the Michigan Supreme Court applied this precise definition: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614 (Mich. 1984) (quoting Restatement of Torts § 757 Comment b). The following factors were applied to determine whether a person had a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting Restatement of Torts § 757 Comment b). Applying these factors, it seems that while ALAS might arguably be a trade secret, it is not SNI's trade secret. In fact, the second factor appears to resolve the question entirely, since the "extent to which [ALAS source code] is known by employees and others involved in [SNI's] business" is *zero*. More importantly, common sense dictates that a person must actually know the secret information or possess the secret device in order to have an advantage over others.

While the Court is aware of no cases presenting this precise issue, a recent Fourth Circuit opinion is helpful. In *DTM Research, L.L.C. v. AT&T Corp.*, 245 F.3d 327 (4th Cir. 2001), the defendant, AT&T, argued that while the plaintiff, DTM, had possession of the purported trade secret, it did not have rightful ownership, and therefore could not prevail

on a claim of trade secret misappropriation. DTM sought to apply principles of personal property law, arguing that "it is not a defense to theft that the property was taken, obtained, or withheld from a person who had obtained possession of the property by illegal means." *Id.* at 331. Thus, while *DTM Research* involved somewhat different facts, the issue was the same: Whether possession or ownership is the appropriate touchstone in determining whether a plaintiff may prevail on a claim of misappropriation of trade secrets.

Applying the Maryland Uniform Trade Secrets Act, the court resolved the dispute as follows:

> While trade secrets are considered property for various analyses, the inherent nature of a trade secret limits the usefulness of an analogy to property in determining the elements of a trade-secret misappropriation claim. The conceptual difficulty arises from any assumption that knowledge can be owned as property. The "proprietary aspect" of a trade secret flows, not from the knowledge itself, but from its secrecy. It is the secret aspect of the knowledge that provides value to the person having the knowledge. The Maryland Uniform Trade Secrets Act thus defines a trade secret as information that has value because it is not "generally known" nor "readily ascertainable." While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value. As a consequence, one "owns" a trade secret when one knows of it, as long as it remains a secret. Thus, one who possesses non-disclosed knowledge may demand remedies as provided by the Act against those who "misappropriate" the knowledge. . . .
>
> Accordingly, if DTM demonstrates that it possesses secret information . . . and that AT&T misappropriated that information . . . by improper means . . . , then DTM may be entitled to the remedies authorized by [the Maryland Uniform Trade Secrets Act].

*Id.* at 332 (internal citations omitted).

The Court agrees with the holding in *DTM Research* that for purposes of trade secrets law, the focus is appropriately on the knowledge, or possession, of the trade secret, rather

than on mere "ownership" in the traditional sense of the word. "One 'owns' a trade secret when one knows of it." *Id.*

DCS offers the following unavoidable truth, which makes clear why SNI does not have a trade secret in ALAS source code: "Even if a customer suddenly developed a need for [ALAS] source code . . . , and placed an order with [SNI], [SNI] could not accommodate that potential customer." (Doc. 324 at 9.) Misappropriation of a trade secret is unlawful because it causes economic harm to the trade secret holder. Because SNI has never possessed ALAS source code, it has never had an advantage over its competitors, and any misappropriation of ALAS caused it no harm. Thus, SNI has no cause of action based on DCS's alleged misappropriation of trade secrets.[9]

### C.   Contract Claim

Based on the recent developments discussed above, DCS has asked the Court to vacate the May 2003 Order, in which the Court granted summary judgment on behalf of SNI as to DCS's breach of contract by disclosing ALAS source code to third parties. Specifically, DCS argues that (1) All of the alleged breaches are immaterial, and thus cannot support a breach of contract claim; (2) There is no unmodified ALAS source code to be disclosed to third parties; and (3) The alleged breaches resulted in no damages, and

---

[9]SNI strenuously argues that the law of the case doctrine forecloses relitigation of this issue. In so arguing, SNI grossly misrepresents the Sixth Circuit's opinion in this case, which, contrary to SNI's contention, "establish[] ALAS's status as a trade secret." (Doc. 325 at 33.) In fact, the Sixth Circuit expressly noted that its decision was not an appeal of this Court's April 2004 Order, which was the first instance in which this Court addressed SNI's trade secrets claim. The Court rejects SNI's argument that the law of the case doctrine bars relitigation of this issue.

hence cannot support a breach of contract claim. (Doc. 323 at 1.) DCS's primary argument relates to damages:

> Now, on the eve of trial, SNI has abandoned the claim upon which this Court issued the May 20, 2003 Order because it now admits that it has no damages associated with the Claimed Disclosures. These claims constitute the sole basis to find that SNI had the right to terminate the Agreement. This Court is now in the position of trying unsupported post-termination damages . . . premised on a now withdrawn claim of breach. In other words, the thing found to be true by the Court is now admitted to be untrue.

(*Id.* at 2 (brackets omitted).)

DCS misunderstands the relationship between the Court's May 2003 Order and SNI's claim for post-termination damages. In the May 2003 Order, the Court held that DCS breached the Software Agreement by disclosing ALAS source code to third parties. The Court did not grant SNI legal relief on the basis of this breach, however. The Court merely granted the equitable remedy that SNI sought: a permanent injunction, per the terms of the license agreement, which gave SNI the right to terminate if DCS breached. The Court simply enforced the contract.

As to the damages stemming from this breach--an essential element of a breach of contract cause of action--the Court noted that "an issue of fact remains as to if Summit has suffered damages by [DCS's] disclosure of its source code to third parties." (Doc. 75 at 21.) This is no longer an issue of fact, as SNI has conceded that it suffered no damages by DCS's disclosure to third parties. Thus, SNI has no claim for legal relief on this theory. The consequence of SNI's concession, however, is not that the Court was wrong to enforce the contract by granting an injunction. Rather, the Court stands by that ruling, which has been affirmed by the Sixth Circuit. SNI's concession merely means that it has no legal claim for contract damages based on the disclosure of ALAS to third-parties.

17

In sum, the Court has not abandoned its finding that DCS breached the Software Agreement by disclosing ALAS source code to third parties, thus giving SNI the right to terminate the Software Agreement.[10] Since there were no money damages stemming from this breach, however, SNI has only two remaining avenues for recovery: (1) Legal relief, or equitable relief under a quantum meruit theory,[11] based on DCS's alleged breach of the Software Agreement by using ALAS at remote locations, and (2) Equitable relief under a quantum meruit theory based on DCS's continued use of ALAS after SNI terminated the Software Agreement.

### III.  Conclusion

For the reasons discussed above, the Court hereby DISMISSES SNI's Copyright and Trade Secrets Claims. SNI's remaining claims shall proceed to trial.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 22, 2006

---

[10]The Court understands that regrettably, the April 2004 Order may have created some confusion on this issue. There, the Court noted that "a genuine issue of material fact remains as to whether the code revealed to third parties was the original source code, or whether it was modified to the extent that the original code was obsolete." (Doc. 213 at 18.) The Court has never understood this issue to have a bearing on whether a breach occurred, however. The factual dispute only affected the damages stemming from the disclosure to third parties, which is now settled.

[11]The purpose of contract damages is to put the injured party in as good a position as it would have been if the contract had been fully performed. While the Court wishes to express no opinion on the issue at this point, it has yet to see how SNI suffered money damages as a result of DCS's alleged use at remote locations. Thus, if SNI prevails on this claim, it might be limited to an equitable remedy under a quantum meruit theory.

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 22, 2006, by electronic and/or ordinary mail.

                                        s/Carol A. Hemeyer
                                        Case Manager